606 S.E.2d 461

**In the Matter of H. Brent FORTSON, Respondent.**

No. 25898.

Supreme Court of South Carolina.

Submitted Oct. 26, 2004.

Decided Nov. 22, 2004.

Henry B. Richardson, Jr., Disciplinary Counsel, and Susan M. Johnston, Deputy Disciplinary Counsel, both of Columbia, for the Office of Disciplinary Counsel.

R. Davis Howser, of Howser Newman & Besley, L.L.C., and Elizabeth Van Doren Gray, of Sowell Gray Stepp & Laffitte, L.L.C., both of Columbia, for respondent.

PER CURIAM:

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent (Agreement) pursuant to Rule 21, RLDE, Rule 413, SCACR. In the agreement, respondent admits misconduct and consents to a sixty (60) day suspension from the practice of law. *See* Rule 7(b), RLDE, Rule 413, SCACR. We accept the Agreement and definitely suspend respondent from the practice of law in this state for a sixty (60) day period. The facts, as set forth in the Agreement, are as follows.

## *FACTS*

Respondent engaged in a business relationship with South Carolina Real Estate Services, LLC, (RES), a company managed by Cathy Pittman, daughter of Anna Knox (Knox), and Attorney Support, Inc., (ASI), a company owned and managed by Knox. These two companies provided services to assist attorneys in the closing of real estate transactions.

Neither Knox nor Pittman were employees of respondent or his law firm during the period relevant to the Agreement. Neither Knox nor Pittman have ever been admitted to the practice of law. At no time relevant to the facts in the Agreement were any persons employed by ASI or RES licensed to practice law. Respondent had no interest in either ASI or RES and paid them as independent contractors for their services on a case-by-case basis.

The functions provided by RES and ASI included communication with lenders, realtors, buyers and sellers, title abstract searches, the preparation and review of legal documents for closings, attendance at closings, issuance of title insurance, the receipt and disbursement of funds for the transaction, and completion of follow up tasks, including but not limited to recording documents in the public records. In connection with the handling of the funds for real estate closings for respondent, ASI provided an "escrow service." All of these functions took place at the offices of RES and/or ASI with the exception of the actual closings which usually took place at respondent's office. Almost all U.S. mail, facsimiles, and other communications and deliveries related to these functions were directed to the offices of RES and/or ASI, as were almost all telephonic communications concerning real estate closings by respondent.

In real estate closings, RES and/or ASI utilized computer generated stationary with respondent's law office letterhead. Use of respondent's letterhead in this fashion was with respondent's knowledge and consent. By using respondent's letterhead and through other means which were known to respondent and to which respondent consented, Knox represented herself as and caused others to believe that she was an employee of respondent or respondent's law firm when, in fact, she was not respondent's employee during the period relevant to the Agreement.

In completing the functions described above, neither RES nor ASI's owners or employees were supervised by a licensed attorney. Respondent did not supervise the work of either RES or ASI, except to review the closing documents and title abstract prior to closings. Generally, all communications concerning ASI's services were directly between respondent and Knox and any services needed from RES were obtained by Knox. Likewise, most communications with lenders and parties to the real estate transactions were handled by Knox, not respondent.

Respondent caused or permitted all funds for these real estate transactions assisted by RES and ASI to be deposited or wired into the ASI "Real Estate Account" which was maintained by ASI at its office. Respondent directed funds

being transferred by wire to be wired by lenders directly to the ASI account managed by Knox at ASI's office. When respondent received checks made payable to his order or the order of his law firm, respondent endorsed the checks and delivered them to Knox. ASI's bank account was not an IOLTA account and it was solely controlled by ASI owner and manager Knox. Bank statements and cancelled checks were sent directly to ASI. Knox had exclusive signatory authority over this bank account and controlled all aspects of it, including deposits, disbursements, possession of checks and deposit slips, and the receipt of monthly bank statements, cancelled checks, and other documents propagated by the bank concerning account activity, all of which was maintained by and in custody and control of Knox at ASI's office. With the exception of a review of the ledger accounts for each closing prepared by Knox, which respondent represents he performed, respondent never inspected or audited the ASI account used by Knox to deposit and thereafter disburse the proceeds of respondent's real estate closings handled by ASI and RES.

The arrangement between respondent and ASI (utilizing the services of RES) was in effect for approximately four years. Either during or after each of the numerous transactions involving RES/ASI, respondent signed the HUD–1 Settlement Statement attesting to the representation printed on the Settlement Statement that respondent certified the funds itemized were an "accurate account of the funds which were received and have been or will be disbursed *by the undersigned* . . ." (emphasis added) or words of similar import or effect. The term "undersigned" on each of these HUD–1 Settlement Statements refers to respondent. In fact, respondent made no disbursements in connection with the RES/ASI assisted real estate transactions and, instead, entrusted the disbursements to be made by Knox from ASI's bank account, the checks and records of which were maintained by Knox at ASI's office. Respondent estimates he consummated approximately 1051 real estate closings by using the services of ASI and/or RES under the foregoing arrangement with Knox making disbursement of the proceeds from the ASI bank account controlled by Knox.

In or around February 2004, respondent learned from Knox's attorney that approximately twelve mortgage payoffs related to real estate closings for respondent's clients handed by ASI and RES had not been paid. Thereafter, respondent made inquiries to Knox about these open and unpaid mortgages which should have been paid in full out of the proceeds of the closings. When confronted, Knox acknowledged to respondent that she had misappropriated funds from the ASI account related to closings for respondent's clients. Knox then produced a document itemizing the transactions in which there were shortages and the amounts thereof. From the documentation submitted in support of the Agreement, it appears the total amount of funds from respondent's clients misappropriated by Knox was approximately $1,151,075.04. These misappropriated monies were funds that had been deposited in the ASI real estate account from closings ASI handled for respondent. These missing funds represent monies allocated for payoffs of mortgages from twelve of respondent's clients. Each of the HUD–1 Settlement Statements from the twelve closings from which money was appropriated bears respondent's signature as "Settlement Agent." One million one hundred fifty one thousand seventy five dollars and four cents remains missing.

After learning of Knox's misappropriation, respondent immediately filed a self-report with Disciplinary Counsel and with his errors and omissions carrier and subsequently paid all amounts due on the mortgages. Knox was indicted and subsequently pled guilty to the misappropriation of $1,151,075.04. Knox admitted to perpetrating an ongoing scheme of retaining mortgage payoffs from respondent's closings over a period of approximately four years. It is now known to respondent that Knox had been regularly misappropriating funds from closings she handled for respondent and was replacing monies previously misappropriated with monies from subsequent closings until her scheme became known.

Respondent did not at any time relevant to the foregoing advise any of his clients of any limitations on his representation in connection with real estate closings. He did not advise his clients that unsupervised non-lawyers were entrusted with the disbursement and accounting of all closing funds, as well

566

as the preparation and completion of closing documents and recording of the same.

Before Knox's misappropriation scheme was discovered, respondent became concerned about liability related to his arrangement with Knox due to certain problems that arose with closings using ASI and/or RES services. These problems were unrelated to and not indicative of Knox's misappropriations. Thereafter, respondent required Knox to present him with evidence of errors and omission insurance policies related to the services being provided. Respondent now recognizes that ASI/RES' insurance policies covered only errors and omissions and that the policies did not provide coverage for misappropriation.

During the period of respondent's foregoing arrangement with RES/ASI, respondent maintained the closing documents but did not maintain the related disbursement records as required by Rule 417, SCACR. Furthermore, during this period, respondent failed to reconcile or even inspect ASI's bank account used for deposits and disbursements of the funds of respondent's clients as required by Rule 417, SCACR. Additionally, respondent never inspected or audited the "Real Estate Account" of ASI. As a result, respondent failed to safekeep the funds of his clients and others and, in so doing, assisted Knox in the unauthorized practice of law.

Respondent now recognizes that allowing non-employees to have access to and control over money which belongs to clients and others and was entrusted to respondent as a result of real estate closings constituted misconduct regardless of whether there were shortages in the "escrow service" account provided by ASI. Respondent now recognizes and acknowledges that the use of an "escrow service" as provided by Knox constitutes lawyer misconduct, regardless of whether the funds were missing and whether the recordkeeping requirements of Rule 417, SCACR, were conducted by respondent.

To ODC's best knowledge and belief, respondent fully cooperated with ODC's inquiries into this matter.

## *LAW*

Respondent admits that by his misconduct he has violated the following provisions of the Rules of Professional Conduct,

Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation to client); Rule 1.2(c) (lawyer may limit objectives of representation with client consent after consultation); Rule 1.4 (lawyer shall keep client reasonably informed about status of a matter); Rule 1.15 (lawyer shall safeguard property of client; lawyer shall maintain complete records of account funds); Rule 5.3 (lawyer shall make reasonable efforts to ensure firm has in effect measures giving reasonable assurance conduct of non-lawyer retained by lawyer is compatible with professional obligations of lawyer; lawyer shall be responsible for conduct of non-lawyer retained by the lawyer if that conduct would be a violation of the Rules of Professional Conduct if engaged in by lawyer and lawyer ratifies the conduct); Rule 5.5(b) (lawyer shall not assist a person who is not a member of the bar in the unauthorized practice of law); **Rule 8.4(a) (lawyer shall not violate Rules of Professional Conduct); Rule 8.4(d) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and Rule 8.4(e) (lawyer shall not engage in conduct that is prejudicial to administration of justice).** In addition, respondent admits he failed to comply with the recordkeeping provisions of Rule 417, SCACR. Finally, respondent admits his misconduct constitutes a violation of Rule 7, RLDE, of Rule 413, SCACR, specifically Rule 7(a)(1) (lawyer shall not violate Rules of Professional Conduct or any other rules of this jurisdiction regarding professional conduct of lawyers) and Rule 7(a)(5) (lawyer shall not engage in conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute or conduct demonstrating an unfitness to practice law).

## *CONCLUSION*

We accept the Agreement for Discipline by Consent and definitely suspend respondent from the practice of law for a sixty (60) day period. Within fifteen days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, Rule 413, SCACR.

**DEFINITE SUSPENSION.**

TOAL, C.J., MOORE, WALLER and BURNETT, JJ., concur. PLEICONES, J., not participating.